**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10106
Telephone: (914) 874-0708
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: sbogdanovich@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MAX VASQUEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VENETIAN LAS VEGAS GAMING, LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Max Vasquez files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Venetian Las Vegas Gaming, LLC ("Defendant" or "Venetian"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. They say what happens in Vegas stays in Vegas. But that is not the case when consumers book hotel rooms online through the VenetianLasVegas.com website (the "Website").

2. Defendant owns and operates the Website. Defendant has purposefully installed various tracking application programming interfaces into the code of its website to aid, employ, agree with, or otherwise enable several third parties – Heap Inc. ("Heap");[1] Google LLC ("Google"); and Meta Platforms, Inc. ("Meta") (collectively, the "Third Parties") – to eavesdrop on communications sent and received by Plaintiff and Class Members. As a result, whenever consumers book rooms to the Venetian through the Website, these third-parties discovery *who* exactly stayed at *which* hotel, *which* suites they stayed in, on *which* dates they came and on *which* dates they left, along with *how* many adults and children they had with them. If they asked for an upgrade the third parties knew that too. As one of those third parties, Heap, boasts, these tracking technologies intercept "all the data on your customers. What they click. Where they go. What they do, even when you're not looking."[2]

3. Because Defendant failed to obtain consumers' consent before enabling the Third Parties to intercept their confidential hotel booking communications, Defendant violated the California Invasion of Privacy Act ("CIPA") §§ 631-632.

## PARTIES

4. Plaintiff Max Vasquez is a resident and citizen of San Jose, California. In or around 2012, Plaintiff Vasquez created a Facebook account. Several times, including on or around

---

[1] Heap was acquired by Contentsquare. CONTENTSQUARE, *Contentsquare Completes Acquisition of Heap* (Dec. 7, 2023), https://contentsquare.com/blog/contentsquare-completes-acquisition-heap/ ("With its largest acquisition to date, Contentsquare strengthens its analytics platform").

[2] HEAP, HOW HEAP WORKS, https://www.heap.io/why-heap/how-heap-works.

1    September 18, 2024, Plaintiff Vasquez visited Defendant's Website, venetianlasvegas.com, on the

2    same browser that he used to access Facebook. Plaintiff Vasquez was in California when he visited

3    the Website. Upon accessing the Website, as alleged in greater detail below, Plaintiff Vasquez

4    browsed and booked a Venetian stay. Each of these communications was intercepted in transit by

5    the Third Parties – as enabled by Defendant – including communications that contained Plaintiff

6    Vasquez's confidential "guest records," as defined by Cal. Civil Code § 53.5. Neither Defendant

7    nor the Third Parties procured Plaintiff Vasquez's prior consent to this interception.

8        5.    Defendant Venetian Las Vegas Gaming, LLC is Nevada corporation with its principal

9    place of business at 3355 Las Vegas Blvd South Las Vegas, NV 89109.

10                              **JURISDICTION AND VENUE**

11        6.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

12    1332(d) because this is a class action where there are more than 100 members and the aggregate

13    amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one

14    member of the putative Class is a citizen of a state different from Defendant.

15        7.    The Court has personal jurisdiction over Defendant because Defendant has

16    purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's

17    claims arise out of Defendant's forum-related activities. Plaintiff accessed and navigated the Website

18    while in California, and Defendant assisted the Third Parties with intercepting Plaintiff's

19    communications in this District.

20        8.    As detailed below, Defendant purposefully, systematically, and repeatedly reached

21    into and targeted California in connection with marketing, promoting and otherwise making

22    available the hotel booking services specifically offered to California residents, including Plaintiff,

23    via the Website.

24        9.    The Court also has specific personal jurisdiction over Defendant because Defendant

25    "obtain[ed] valuable personal data about California consumers for its own commercial gain."

26    *Briskin v. Shopify, Inc.*, 135 F.4th 739, 756 (9th Cir. 2025) (en banc). Through those business

27    activities, Defendant tortiously violated Plaintiff's and Class Members' privacy through its

28    collection, maintenance, and sale of valuable personal data from California consumers.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### I.     The California Invasion of Privacy Act

11.     The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens.  The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

12.     The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

13.     Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

14.     As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent

from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any information so obtained."

15.    CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

16.    As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

17.    A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."  Cal. Penal Code § 632(c).

18.    Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).  Plaintiff does so, here, against Defendant.

## II.    California Civil Code § 53.5

19.    As the California Legislature recognized, a "guest record" maintained by an owner or operator of an inn, hotel, motel, lodginghouse, or other similar accommodations is confidential.  Such an owner or operator "shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order."  Cal. Civil Code § 53.5(a).

20.    Per Cal. Civil Code § 53.5(c):

> "Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

21.    Further, the legislative history of § 53.5 indicates:

(a) In 1972, California voters amended the California Constitution to

---

include the right of privacy among the "inalienable" rights of all people. The amendment established a legal and enforceable right of privacy for every Californian. Fundamental to this right of privacy is the ability of individuals to control the use of their personal information.

(b) Since California voters approved the right of privacy, the California Legislature has adopted specific mechanisms to safeguard consumer privacy, including the California Consumer Privacy Act of 2018, the Online Privacy Protection Act, the Reader Privacy Act, the Privacy Rights for California Minors in the Digital World Act, and Shine the Light, a California law intended to give Californians the 'who, what, where, and when' of how businesses handle consumers' personal information.

(c) Californians frequently have to disclose their sensitive personal information to third parties in order to accomplish routine activities: apply for a job; apply for housing; raise a child; drive a car or take transportation; or stay at a hotel or motel.

(d) California law has not kept pace with these developments and the personal privacy implications surrounding the collection, use, and protection of personal information by third parties.

(e) Many businesses collect personal information from California consumers. They may know where a consumer lives, how many children a consumer has, where a consumer lives and works, where a consumer travels and where they stay on their trip, how fast a consumer drives, a consumer's personality, sleep habits, biometric and health information, financial information, precise geolocation information, and social networks, to name a few categories.

(f) The unauthorized disclosure of personal information and the loss of privacy can have devastating effects for individuals, including financial fraud, identity theft, unnecessary costs to personal time and finances, destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.

(g) When Californians leave their homes to travel via bus or stay at lodging establishments throughout their state, they desire assurances that these businesses will respect their privacy and safeguard their personal information from improper disclosure.

(h) Protecting the privacy of personal information promotes consumer confidence and encourages both residents and visitors to travel to and within California and to patronize California businesses.

(i) Therefore, it is the intent of the Legislature to further Californians' right to privacy by ensuring that the personal information disclosed by patrons of lodging establishments and bus companies is used for the

intended business purposes and not improperly disclosed.

California S.B. 1194 (September 27, 2018).[3]

22.     Here, Website users' communications with Venetian – made while browsing and booking a Venetian hotel stay via the Website – contain sensitive and confidential "guest records," as defined by Cal. Civil Code § 53.5.

23.     First, the communications include "record[s] that identif[y] an individual[.]"  Cal. Civil Code § 53.5(c).  As described *infra*, §§ IV, VI, Defendant enables Heap to identify individual Website users through a combination of Heap cookies and Heap user IDs.  Defendant enables Google to identify individual Website users with Google Analytics identity spaces – a combination of user IDs, user-provided data (i.e., contact details like email address, phone number, name, and/or address, etc.), device IDs, and/or machine learning-based behavioral modeling – and Google signals (which associates web browsing activity with users' Google accounts). Defendant enables Meta to identify individual Website users by their respective Facebook accounts, utilizing several cookies, including the c_user; datr; fr; and _fbp cookies. Defendant also enables Meta to identify individual Website users through advanced matching, by which Meta records the contact details Website users provide on the Website (i.e., name, email address, phone number, etc.).  These pieces of data collected by Heap, Google, and Meta constitute "record[s] that identif[y] an individual" (Cal. Civil Code § 53.5(c)), as the cookies and other IDs at issue contain "unique identifying number[s]" assigned to Website users (*id.*) and the contact details (i.e., name, email address, phone number, etc.) at issue are sufficient to identify individuals.  *Id.*

24.     Website users' communications with Venetian also "identif[y] an individual [as a Venetian] guest, boarder, occupant, lodger, customer, or invitee[.]"  *Id.*  The Third Parties intercept Website users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular tower and room type in which they wish to stay.  The Third Parties also intercept the URL of webpages visited by Website users – containing the foregoing communications.

---

[3] https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1194.

These communications "identif[y] an individual [as a Venetian] guest, boarder, occupant, lodger, customer, or invitee" (Cal. Civil Code § 53.5(c)) because they show that all Website users are "invitees" of Venetian – individuals with "express or implied invitation to enter or use [Venetian's] premises."[4]  These communications also identify certain Website users (those who complete the booking process) as Venetian hotel "guests" and "customers."

25.      Thus, the Third Parties – as aided by Defendant – intercepted "guest records," which are confidential, under Cal. Civil Code § 53.5.  Moreover, none of the Third Parties is a legitimate "third-party service provider," as defined by Cal. Civil Code § 53.5(f), because none of the Third Parties is "an entity contracted to provide services outlined in [a] contract [with Venetian] that has no independent right to use or share the data beyond the terms of the contract."  Rather, the Third Parties have the capability to use the information they wiretap for purposes other than simply providing a recording to Defendant.  *See infra*, § VII.  Therefore, Defendant's conduct here at issue was not permitted by Cal. Civil Code § 53.5(i).

**III.      Overview of Defendant's Website**

26.      Defendant owns and operates the Website.  Defendant has integrated the Third Parties' wiretaps into the Website.

27.      On the Website, Website users can browse and book Venetian stays.  When doing so, Website users provide Defendant with confidential information, including "guest records" under Cal. Civil Code § 53.5.  *See supra* § II.

28.      Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with, employs, or otherwise enables the Third Parties to eavesdrop on those confidential communications using the Third Parties' respective wiretaps, as set out *infra*.

29.      Website users' confidential communications are the product of Website users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated).  Instead, as set out below, the confidential communications stem from Website users typing into data fields, conveying responses to questions and prompts, and actively making other selections.  All of the foregoing is information

---

[4] INVITEE, Black's Law Dictionary (11th ed. 2019).

created through the intent of Website users: information created by and in response to Website users' communicative inputs; information created by and in response to Website users' intended messages to the Website and Defendant; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

30.    Website users may browse and book Venetian hotel rooms.  To do so, users click the dates for their trip and the number of adults and children who will be traveling.  *See* Screens 1 and 2, below and on the following page.  The Third Parties, as enabled by Defendant, contemporaneously intercept Website users' button clicks selecting such items:





**Website "Screen 1"**

///

///

///

///

///

///







**Website "Screen 2"**

1      31.      Next, Website users review available offers and suites.  *See* Screen 3A.  Website

2   users may click "See All" to see all offers and select a particular offer.  *See* Screen 3A; *see also*

3   Screen 3B ("Book Direct: Up to 25% Off").  Website users may also click on "Filters" to search

4   for different suites (*see* Screen 3A) based on (1) the desired tower ( "the Venetian" or "the

5   Palazzo"); (2) the number of beds ("one bed" or "two beds"); and (3) accessibility. *See* Screen 3C.

6   Once users have selected an offer and a suite, users click "Select Suite" and "Next Step." *See*

7   Screens 3D and 3E, next page.



**Website "Screen 3A"**



**Website "Screen 3B"**                    **Website "Screen 3C"**




Website "Screen 3D"                    Website "Screen 3E"

32.    At this point, Venetian asks users whether they wish to "[u]pgrade [their] view."

Users can keep the default, "Standard View" or upgrade to a "City View" or "Sphere View." *See*

Screen 4, next page.  Once users have selected their desired view, they click "Next Step." *See id.*

///

///

///

///

///

///

///

///

///

///

///



**Website "Screen 4"**

33.    Finally, Website users check out by typing their personal information (first and last name, email, phone number) and entering their payment information. *See* Screen 5.



**Website "Screen 5"**

## IV.    Overview of the Third Parties' Tracking Technologies

34.    Heap, Google, and Meta each wiretap the Website with their respective tracking technologies, which Defendant purposefully installed on the Website.

35.    The Third Parties' tracking technologies send secret instructions to a Website user's browser, without alerting the individual that this is happening.  The trackers then cause the browser to secretly and simultaneously duplicate the user's Website communications, transmitting these communications to the Third Parties' servers alongside additional information about the Website user's identity.   This entire process occurs within milliseconds.   In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to the Third Parties at the same time as they are being sent to Defendant.  Thus, the Third Parties' interception of these communications occurs "in transit."  *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, 710 F. Supp. 3d 942, 961-62 (N.D. Cal. 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

### A.    Heap

44.    Heap wiretaps the Website with its tracking technology,[5] which intercepts consumers' activities on websites into which the tracking technology has been integrated.[6]  Heap explains its tracking technology allows Heap to collect "all the data on your customers[.] What they click.  Where

---

[5] *See, e.g.*, HEAP, INSTALLATION, https://developers.heap.io/docs/web ("To get started with Heap, paste the following code snippet …").

[6] *See* HEAP, AUTOCAPTURED DATA, https://help.heap.io/hc/en-us/articles/18700150592924-Autocaptured-Data ("Heap's power comes from automatically capturing a wealth of user interactions in your app, which are classified as events and properties.").

they go.  What they do, even when you're not looking."[7]

45.    Defendant chose to integrate the Heap tracking technology into the Website by intentionally placing the Heap code therein.[8]

46.    Heap advertises that its tracking technology collects "data [that] is organized into [a] hierarchy … where users belong to accounts, users have many sessions, sessions include pageviews, and during those pageviews, events occur."[9]

47.    Activities that Heap intercepts and/or otherwise obtains via the Website include but are not limited to users' button clicks and page views.[10]

48.    Heap also collects what it calls "sessions." Sessions encompass both "pageviews" and "events."  Heap further explains that "[a] session in Heap is a period of activity from a single user in your app or website. It can include many pageviews or events."  Session "properties" include but are not limited to "User ID", meaning "[t]he ID of the associated user[;]" "[p]latform", meaning "[t]he user's operating system[,]" and "[c]ountry" and "[r]egion, based on [users'] geolocation data."[11]

49.    Once Heap collects the activities that users take on the Website, Heap processes the activities and then allows clients like Defendant to analyze that data.

50.    Specifically, Heap provides for analysis through segments,[12] dashboards,[13] charts,[14] and playbooks.[15]  Segments allow clients like Defendant to, among other things, "target[] behavior-

---

[7] HEAP, HOW HEAP WORKS, https://www.heap.io/why-heap/how-heap-works.

[8] *See* HEAP, INSTALLATION, https://developers.heap.io/docs/web ("To get started with Heap, paste the following code snippet …").

[9] HEAP, AUTOCAPTURED DATA, https://help.heap.io/hc/en-us/articles/18700150592924-Autocaptured-Data (last accessed June 2, 2025); *see also* HEAP, *Episode 1: Autocapture*, https://www.heap.io/why-heap/how-heap-works.

[10] *See* HEAP, AUTOCAPTURED DATA, https://help.heap.io/hc/en-us/articles/18700150592924-Autocaptured-Data.

[11] HEAP, SESSION PROPERTIES, https://help.heap.io/hc/en-us/articles/18700150592924-Autocaptured-Data#session-properties (last accessed June 11, 2025).

[12] HEAP, SEGMENTS, https://www.heap.io/platform/segments.

[13] HEAP, DASHBOARDS, https://www.heap.io/platform/dashboards.

[14] HEAP, CHARTS, https://www.heap.io/platform/charts.

[15] HEAP, PLAYBOOKS, https://www.heap.io/platform/playbooks.

---

driven cohorts in marketing suites[.]"[16]  Dashboards allow clients to "drive measurable business outcomes by letting you custom group relevant charts."[17]  Charts "are saved analysis results. … For example, … to track pageviews and searches[.]"[18]  Clients can even "export a chart" to "Google Sheets[.]"[19]  And charts are important because clients can use them to "[g]raph conversion events, build funnels, track retention, and figure out which growth levers influence [Defendant's] business the most."[20]  Additionally, Defendant can "track[] key behaviors" by using "Playbooks [which] are pre-built dashboard templates, customized by industry, that let you generate charts and see relevant insights faster than ever."[21]  For example, Heap's dashboards allow "access to … user demographics" and "product engagement."[22]

51.     Thus, Heap provides Defendant with the ability to further optimize and monetize its Website.

**B.     Google**

52.     Google wiretaps the Website with trackers associated with "Google Analytics."[23] According to Google, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[24]  "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site."[25]  Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with

---

[16] *Supra* note 11.

[17] *Supra* note 12.

[18] HEAP, CHARTS OVERVIEW, https://help.heap.io/hc/en-us/articles/18699972739612-Charts-Overview (last accessed June 11, 2025).

[19] *Id.*

[20] *Supra* note 13.

[21] *Supra* note 14.

[22] *Supra* note 12.

[23] GOOGLE, START LEARNING ABOUT GOOGLE ANALYTICS, https://developers.google.com/analytics.

[24] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447.

[25] *Id.*

the page."[26]    Specifically, Google Analytics tracks "events"; "sessions"; and "users[.]"[27]

53.    "Events let [clients] measure … when someone loads a page, clicks a link, [] makes a purchase[]" and more.[28]    Google provides a menu of "recommended events" (i.e., "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; "views their shopping cart")[29] and also allows for "collect[ing] additional information that Google Analytics does not collect automatically[,]" through "custom events."[30]

54.    A "session" is "the period from when a user visits [a] website or app to when they leave [said] website or app[.]"[31]    "When a session starts, Google automatically collects a session_start event and generates a session ID (ga_session_id) and session number (ga_session_number)[.]"[32]

55.    Finally, to discern when "two different [users] interact with [a] website[,] … Google Analytics identifies an individual user based on [Google Analytics] reporting identit[ies.]"[33] Reporting identities are combinations of "identifiers … called *identity spaces*" – namely, "User-ID"; "user-provided data"; "device ID"; and "modeling[.]"[34]

- A "User-ID" is a "persistent ID[,]"[35] consisting of a unique combination of up to "256 characters[,]"that is created by website operators and "assign[ed] and consistently reassign[ed] … to [] users[,] … typically [] during login."[36]

- "User-provided data" consists of contact details such as "email, phone,

---

[26] *Id.*

[27] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

[28] GOOGLE, SET UP EVENTS, https://developers.google.com/analytics/devguides/collection/ga4/events.

[29] GOOGLE, [GA4] RECOMMENDED EVENTS, https://support.google.com/analytics/answer/9267735.

[30] GOOGLE, [GA4] CUSTOM EVENTS, https://support.google.com/analytics/answer/12229021.

[31] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

[32] GOOGLE, [GA4] ABOUT ANALYTICS SESSIONS, https://support.google.com/analytics/answer/9191807.

[33] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

[34] GOOGLE, [GA4] REPORTING IDENTITIES, https://support.google.com/analytics/answer/10976610.

[35] *Id.*

[36] GOOGLE, [GA4] MEASURE ACTIVITY ACROSS PLATFORMS WITH USER-ID, https://support.google.com/analytics/answer/9213390.

---

name and address[,]" provided by website users, that "is [] matched with other Google data … to improve the accuracy of [] measurement data and power enhanced Analytics capabilities."[37]  Although these personal details are "hashed,"[38] the reality is that, even in hashed form, they are traceable to individuals.[39]

- A "device ID" is a "browser-based or mobile-app-based identifier[.]"[40] "On a website, device ID gets its value from the client ID property of the _ga cookie. In an iOS or Firebase app, device ID gets its value from the app-instance ID, which identifies a unique installation of the app."[41]

- "Modeling" uses "machine learning to model the behavior of users who decline analytics cookies based on the behavior of similar users who accept analytics cookies."[42]

56.    Google Analytics can also leverage "Google signals," which "associates [data] with user[s'] … Google accounts," for "users who have signed in …  and who have turned on Ads

---

[37] GOOGLE, [GA4] USER-PROVIDED DATA COLLECTION, https://support.google.com/analytics/answer/14077171.

[38] *Id.*

[39] *See, e.g.*, FEDERAL TRADE COMMISSION, DOES HASHING MAKE DATA "ANONYMOUS"?, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong."); FEDERAL TRADE COMMISSION, NO, HASHING STILL DOESN'T MAKE YOUR DATA ANONYMOUS, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); STEVEN ENGLEHARDT ET AL., I NEVER SIGNED UP FOR THIS! PRIVACY IMPLICATIONS OF EMAIL TRACKING, https://petsymposium.org/2018/files/papers/issue1/paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful privacy protection. This is folk knowledge in the security community, but bears repeating."); MARTECH, FTC PRIVACYCON: YOUR EMAIL ADDRESS IS LEAKING AND VULNERABLE, https://martech.org/ftc-privacycon-email-address-leaking-vulnerable ("Hashing is an algorithmic process that turns [information] into a gibberish label[.] … Although gibberish, it's unique, so it can be employed as an anonymized identifier. It's supposed to be one-way, meaning that you can't turn the gibberish back into the [original form]. Wrong, says Englehardt and his colleagues.").

[40] GOOGLE, [GA4] DEVICE ID, https://support.google.com/analytics/answer/9356035.

[41] *Id.*

[42] GOOGLE, [GA4] BEHAVIORAL MODELING FOR CONSENT MODE, https://support.google.com/analytics/answer/11161109.

---

Personalization."[43]  "This association of data with these signed-in users is used to enable cross-device remarketing, and cross-device key events export to Google Ads."[44]

### C.    Meta

57.    Meta wiretaps the Website with trackers associated with the "Meta Pixel."[45] According to Meta, "[t]he Meta Pixel is a snippet of JavaScript code that allows [clients] to track visitor activity on [their] website[s]. It works by loading a small library of functions which [] can [be] use[d] whenever a site visitor takes an action (called an event) that [a client] want[s] to track (called a conversion)."[46]  Meta offers a menu of "standard events" that can be tracked, including what content a visitor views or purchases.[47]  Advertisers can also create their own tracking parameters by building a "custom event."[48]  Thus, the Meta Pixel helps "understand[] the actions people take on [a] website."[49]

58.    The Meta Pixel "relies on Facebook cookies, which enable [Meta] to match [] website visitors to their respective Facebook User accounts."[50]  Additionally, "[w]ith advanced matching, [website operators] can send [Meta] hashed customer information along with [] Meta Pixel events, which can help … match more of the conversions that happen on your website to people on Meta."[51]

---

[43] GOOGLE, [GA4] ACTIVATE GOOGLE SIGNALS FOR GOOGLE ANALYTICS PROPERTIES, https://support.google.com/analytics/answer/9445345.

[44] Id.

[45] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[46] Id.

[47] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655.  See also META, STANDARD EVENTS, https://developers.facebook.com/docs/meta-pixel/reference.

[48] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005; see also META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[49] Id.

[50] META, META PIXEL GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

[51] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

---

59.     This is highly useful for marketing and advertising.  Specifically, the Meta Pixel can be used to help "measure ad effectiveness"; "define custom audiences for ad targeting"; and support "Advantage+ catalog ads campaigns[.]"[52]

60.     With respect to measuring ad effectiveness, "[t]rack[ing ] website visitors' actions[,] also known as conversion tracking[,] ... can be used to ... calculate [] return[s] on ad investment[s]."[53] "In [the] Meta Ads Manager, [website operators] can see how many conversions happened as a result of [their] Meta ads."[54]  This includes "cross-device reporting, which lets [advertisers] see cross-device conversions across apps and the web (for example, if a customer sees an ad for a product on their mobile phone, but decides to buy it later on their desktop computer)."[55]

61.     A "custom audience is an ad targeting option"[56] that can be used by advertisers, like Defendant, "to find people most likely to respond to [their] ad[s]."[57]  Clients can "[c]reate [an] online audience based on the traits of who [they] want to see [their] ad[s], and narrow down [their] ad[s'] audience[s] by interests, gender or location and use ad targeting to find the people most likely to take action.  Once [an] ad starts running, [Meta's] system will learn who is engaging with it and, over time, narrow [the] audience [to help] reach more of the right people."[58]  Advertisers can target, among other things, "[n]ew customers with specific interests or from a specific location"; "[p]eople who have already shown an interest in [a client's] business"; and "[p]eople who share interests with [a client's] current customers[]" (i.e., "Lookalike Audience[s]").[59]

---

[52] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[53] META, CONVERSION TRACKING, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

[54] META, USE CONVERSION TRACKING TO MEASURE RESULTS, https://www.facebook.com/business/help/339239069606476.

[55] Id.

[56] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227.

[57] META, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[58] Id.

[59] Id.

62.    "Advantage+ catalog ads are dynamically created by populating an ad template with product information found in a data feed. This allows [Meta clients] to create thousands of ads without having to configure each of them individually."[60]  Clients "can also use Advantage+ catalog ads to target visitors based on how they have interacted with [their] website in the past."[61]

**V.    Defendant Aids, Agrees with, Employs, or Otherwise Enables the Third Parties to Wiretap Californians' Communications**

**A.    Heap**

63.    Heap, as enabled by Defendant, contemporaneously intercepts the following Website communications.

| | |
|---|---|
| pp | Reservations \| The Venetian Resort Las Vegas |
| pp | ts |
| pp | 1757964173200 |
| pp | pr |
| pp | /resort/trip-guides/venice-meets-vegas.html |
| id0 | 971767534284386 |
| k0 | Optimizely: BE-009 \| BE Extra Calendar Features |
| k0 | AA |
| k0 | checkoutstep |
| k0 | 1 |
| k0 | pagename |
| k0 | /book |
| t0 | Booking Page - Step 1 - See Calendar |

64.    As shown by the red highlights in the above excerpt of the Website's transmissions, Heap intercepts that a user is making a reservation on Defendant's website (here, "Reservations | The Venetian Resort Last Vegas") and that users are at the first step of the Venetian booking process (here, "Booking Page - Step 1 - See Calendar").  These communications are the product of button clicks on Website Screen 1.

//

---

[60] META, META PIXEL FOR ADVANTAGE+ CATALOG ADS, https://developers.facebook.com/docs/meta-pixel/get-started/advantage-catalog-ads.

[61] *Id.*

| | |
|---|---|
| k1 | checkoutstep |
| k1 | 2 |
| k1 | pagename |
| k1 | /book |
| k1 | arrivalDate |
| k1 | 25/02/2026 |
| k1 | departureDate |
| k1 | 27/02/2026 |
| k1 | nights |
| k1 | 2 |
| k1 | adults |
| k1 | 2 |
| k1 | children |
| k1 | 1 |
| k1 | totalGuests |
| k1 | 3 |
| k1 | searchRoomAvailability |
| k1 | Yes |
| t1 | Booking Page - Step 2 - Select Guests & Dates |

65.     As shown by the red highlights in the above excerpt of the Website's transmissions, Heap intercepts that a user is in the process of searching room availability based on the number of guests and desired dates for their trip (here, "Booking Page - Step 2 - Select Guests & Dates" and "searchRoomAvailability").  As shown by the blue highlights, Heap intercepts the number of adults, children, and total guests selected by users (here, "adults…2"; "children…1"; "totalGuests…3").  As shown by the yellow highlights, Heap further intercepts the desired trip dates selected by users (here, arrivalDate" of "25/02/2026" and "departureDate" of "27/02/2026" for a total of "2" "nights").  These communications are the product of button clicks on Website Screen 2.

///

///

///

///

///

///

| | | |
|---|---|---|
| t0 | | click |
| n0 | | button |
| c0 | | flex w-full gap-2 rounded-[3px] border p-4 border-red bg-light-yellow |
| i0 | | booking-suites-offer-expandable |
| y0 | | @main;.flex;.flex-1;.flex-col;.h-full;\|@div;.flex;.flex-1;.flex-col;.h-full;\|@div;.bg-gray1;.flex;.flex-1;.flex-col;\|@div;#booking-page-layout-container;.flex;.flex-1;.w-full;\|@div;.border-crema;.flex x;.flex-1;.flex-row;.lg:h-calc(100vh-110.5px);.lg:overflow-y-scroll;.relative;\|@div;.flex;.flex-col;.h -full;.lg:w-480px;.relative;.w-full;.xl:w-554px;\|@div;.flex;.flex-1;.lg:border-crema;.lg:border-r;.mi n-1440px:border-l;.print:flex-col;.print:items-center;.sidebar;\|@div;.flex;.flex-col;.w-full;\|@div;.f lex-col;.hidden;.lg:flex;\|@div;#booking-suites-available-offer;.relative;\|@div;.0.50};.112;.:112;.;. bg-gray1;.border-b;.border-rgba(112;.flex;.flex-col;.gap-4;.lg:px-12;.lg:py-18px;.p-4;.transitio ns-colors;\|@div;.relative;\|@button;#booking-suites-offer-expandable;.bg-light-yellow;.borde r;.border-red;.flex;.gap-2;.;.p-4;.rounded-3px;.w-full;\| |
| k0 | | Optimizely: BE-009 \| BE Extra Calendar Features |
| k0 | | AA |
| ts0 | | 1757964985492 |
| x0 | | Book Direct: Up to 25% Off |
| | | When you book 2 nights or more |
| sch0 | | 944 |

| | | | | | |
|---|---|---|---|---|---|
| ts0 | 1757965398533 | ts0 | 1757965457192 | ts0 | 1757965608217 |
| x0 | FILTERS | x0 | THE VENETIAN | x0 | + SELECT SUITE |
| sch0 | 944 | sch0 | 944 | sch0 | 944 |

| | | |
|---|---|---|
| i0 | | booking-suites-selected-room |
| y0 | | @main;.flex;.flex-1;.flex-col;.h-full;\|@div;.flex;.flex-1;.flex-col;.h-full;\|@div;.bg-gray1;.flex;.flex-1;.flex-col;\|@div;#booking-page-layout-container;.flex;.flex-1;.w-full;\|@div;.border-crema;.flex x;.flex-1;.flex-row;.lg:h-calc(100vh-110.5px);.lg:overflow-y-scroll;.relative;\|@div;.flex;.flex-col;.h -full;.lg:w-480px;.relative;.w-full;.xl:w-554px;\|@div;.flex;.flex-1;.lg:border-crema;.lg:border-r;.mi n-1440px:border-l;.print:flex-col;.print:items-center;.sidebar;\|@div;.flex;.flex-col;.w-full;\|@div;. bg-gray1;.border-red;.border-t;.bottom-0;.lg:border-crema;.lg:px-12;.lg:py-7;.sticky;.w-full;.z- 20;\|@button;#booking-suites-selected-room;.bg-red;.bottom-0;.disabled:bg-#D9D9D9;.disa bled:font-medium;.disabled:text-#A3A1A1;.flex;.font-bold;.items-center;.justify-center;.lg:font -medium;.lg:justify-start;.lg:text-14px;.lg:tracking-1.68;.p-7;.sticky;.text-18px;.text-gray1;.tracki ng-1.92px;.uppercase;.w-full;\| |
| k0 | | Optimizely: BE-009 \| BE Extra Calendar Features |
| k0 | | AA |
| ts0 | | 1757965628700 |
| x0 | | NEXT STEP |

66.     As shown by the purple highlights in the above excerpts of the Website's transmissions, Heap intercepts the particular offer selected by users (here, "booking-suites-offer-expandable"; "Book Direct: Up to 25% Off" "When you book 2 nights or more").  As shown by the brown highlights, Heap also intercepts when users click "Filters" to search for different suites (here, "FILTERS").   Heap further intercepts the particular tower selected by users (here, "THE

VENETIAN"), that users select a particular suite (here, "+ SELECT SUITE"; "booking-suites-selected-room"), and that users click "Next Step" to proceed with the booking process (here, "NEXT STEP"). These communications are the product of button clicks on Website Screens 3A-3E.

| ts0 | 1757965877509 |
|-----|---------------|
| x0  | + ADD VIEW UPGRADE |
| sch0 | 944 |

| ts1 | 1757965896971 |
|-----|---------------|
| x1  | NEXT STEP |
| sch1 | 944 |

67.    As shown by the brown highlights in the above excerpts of the Website's transmissions, Heap intercepts when users upgrade their view and click "Next Step" to continue with the booking process (here, "+ ADD VIEW UPGRADE" and "NEXT STEP"). These communications are the product of button clicks on Website Screen 4.

| k0 | nights |
|----|--------|
| k0 | 2 |
| k0 | adults |
| k0 | 2 |
| k0 | children |
| k0 | 1 |
| k0 | totalGuests |
| k0 | 3 |
| k0 | searchRoomAvailability |
| k0 | Yes |
| k0 | suiteName |
| k0 | New Luxury Loft Two Queen Sphere View |
| k0 | roomRate |
| k0 | 400 - 450 USD |
| k0 | offerCode |
| k0 | MVFDE2PV |
| k0 | suiteOptions |
| k0 | luxury |

///

///

///

///

| | |
|---|---|
| pp | Reservations \| The Venetian Resort Las Vegas |
| pp | ts |
| pp | 1757966592305 |
| pp | pr |
| pp | /book/upgrades |
| id0 | 1227157519817929 |
| k0 | Optimizely: BE-009 \| BE Extra Calendar Features |
| k0 | AA |
| k0 | checkoutstep |
| k0 | 3 |
| k0 | pagename |
| k0 | /book/checkout |
| k0 | arrivalDate |
| k0 | 25/02/2026 |
| k0 | departureDate |
| k0 | 27/02/2026 |

| | |
|---|---|
| k0 | roomTotal |
| k0 | 933.5 |
| k0 | hotel |
| k0 | venetian |
| t0 | Booking Page - Step 3 - Selected Suite and Offer |

68.    As shown by the red highlight in the above excerpts of the Website's transmissions, Heap intercepts the fact that users are in the final step of the checkout process (here, "Booking Page - Step 3 - Selected Suite and Offer" and "Reservations | The Venetian Resort Las Vegas").  As shown by the pink highlights, Heap also intercepts the room rate selected (here, "roomRate" and  "400 - 450 USD", as in the rate is $400-$450 per night) and the subtotal owed by users (here, "roomTotal"; "933.5" as in $933.50 subtotal).  As shown by the brown highlight, Heap also intercepts the particular hotel tower that users have selected (here, "venetian" as in the Venetian tower).  As shown by the green highlights, Heap further intercepts the name of the particular suite selected by users (here, "suiteName" and "New Luxury Loft Two Queen Sphere View").  And as shown by the yellow and blue highlights, Heap once again intercepts the number of adults, children, and total guests and the desired trip dates selected by users.  These communications are the product of button clicks on Website Screens 2-5.

///

| | |
|---|---|
| pp | t |
| pp | Luxury Hotel in Las Vegas \| The Venetian Resort Las Vegas |
| pp | ts |
| pp | 1755727606555 |
| pp | pr |
| pp | /confirmation-page.html |
| id0 | 8013862688289353 |
| t0 | click |
| n0 | span |
| c0 | cmp-booking__calendar__input__end_date |

69.     As shown by the red highlights in the above excerpt of the Website's transmissions, Heap intercepts the fact that Website users have completed the booking process (here, "confirmation-page"). These communications are the product of button clicks on Website Screen 5.

**B.     Google**

70.     Google, as enabled by Defendant, contemporaneously intercepts the following Website communications.

| | |
|---|---|
| dt | Reservations \| The Venetian Resort Las Vegas |
| _tu | KA |
| en | select_item |
| pr1 | k0offer_type~v0FIT~k1offer_components~v1~pi~pn~lp2~Insuites~nn~New Luxury Loft Two Queen~i dVSQL~pr344.25~cpMVFDE2PV~afv1~casuites~c2luxury~c32 bed~brvenetian~qt2~ds0 |
| ep.gtm_details | GTM-W99CR8JS: 88 |
| ep.gtm_tag_name | GA4 - Configuration |
| ep.hostname | www.venetianlasvegas.com |
| ep.color_mode | Light |
| ep.checkout_type | v1 |
| epn.number_adults | 2 |
| epn.number_children | 1 |
| epn.number_totalGuest | 3 |
| ep.offer_type | FIT |
| ep.offer_components | |
| epn.value | 905.34 |
| ep.coupon | MVFDE2PV |
| ep.arrival_date | 2026-02-25 |
| ep.departure_date | 2026-02-27 |
| epn.nights | 2 |

///

///

| en | add_to_cart |
|---|---|
| pr1 | k0offer_type~v0FIT~k1offer_components~v1~pi~pn~lp2~lnsuites~nm New Luxury Loft Two Queen ~i dVSQL~pr344.25~cpMVFDE2PV~afv1~casuites~c2luxury~c3 2 bed ~b venetian~ qt2~ds0 |

71.     As shown by the red highlight in the above excerpts of the Website's transmissions, Google intercepts that users are looking to make a reservation on Defendant's website (here, "Reservations | The Venetian Resort Las Vegas."). As shown by the yellow highlights, Google further intercepts the desired trip dates selected by users (here, arrival_date of "2026-02-25" and "departure_date" of "2026-02-27" for a total of "2" "nights"). As shown by the blue highlights, Google intercepts the number of adults, children, and total guests selected by users (here, "2" "adults"; "1" "child[]"; and "3" "totalGuest[s]").   As shown by the green highlights in the above excerpts of the Website's transmissions, Google intercepts the name of the suite selected by users (here, "select_item"; "add_to_cart"; "New Luxury Loft Two Queen").   As shown by the brown highlight, Google intercepts the number of beds and the particular tower selected by users (here, "2 bed…venetian").  These communications are the product of button clicks on Website Screens 2 and 3A-3E.

| dl | https://www.venetianlasvegas.com/book upgrades |
|---|---|
| dr | https://www.venetianlasvegas.com/book?adults[]=2&arrival_date=2025-09-16&children[]=0&departu re_date=2025-09-18&view=calendar |
| dt | Reservations | The Venetian Resort Las Vegas |
| _tu | KA |
| en | select_item |
| pr1 | k0offer_type~v0FIT~k1offer_components~v1~pi~pn~lp3~ln views~nmSphere View ~afv1~caviews~p r68~ds0 |

| en | add_to_cart |
|---|---|
| pr1 | k0offer_type~v0FIT~k1offer_components~v1~pi~pn~lp3~ln views~nmSphere View ~afv1~caviews~p r68~ds0 |

72.     As shown by the brown highlights in the above excerpts of the Website's transmissions, Google intercepts when users upgrade their room view and click to continue with the booking process (here, "upgrades"; "Sphere View"; "add_to_cart").  These communications are the product of button clicks on Website Screen 4.

///

///

///

| dl | https://www.venetianlasvegas.com/book/checkout |
| dr | https://www.venetianlasvegas.com/book/upgrades |
| sid | 1757973826 |
| sct | 3 |
| seg | 1 |
| dt | Reservations \| The Venetian Resort Las Vegas |
| _tu | KA |
| en | page_view |

73.    As shown by the red highlights in the above excerpt of the Website's transmissions, Google intercepts the fact that users click to proceed to the final checkout step of the booking process (here, "book/checkout" and "Reservations | The Venetian Resort Las Vegas"). These communications are the product of button clicks on Website Screen 4.

| dt | Luxury Hotel in Las Vegas \| The Venetian Resort Las Vegas |
| sid | 1755727227 |
| sct | 1 |
| seg | 1 |
| dl | https://www.venetianlasvegas.com/ |
| dr | https://www.venetianlasvegas.com/confirmation-page.html |
| _tu | Cg |
| en | page_view |

74.    As shown by the red highlights in the above excerpt of the Website's transmissions, Google intercepts the fact that users have completed the booking process (here, "confirmation-page"). These communications are the product of button clicks on Website Screen 5.

**C.    Meta**

75.    Meta, as enabled by Defendant, contemporaneously intercepts the following Website communications.

| ev | PageView |
| dl | https://www.venetianlasvegas.com/book?adults[]=2&arrival_date =2025-09-16&children[]=0&departure_date=2025-09-18&view =calendar |

| pmd[title] | Reservations \| The Venetian Resort Las Vegas |

76.    As shown by the red highlights in the above excerpts of the Website's transmissions, Meta intercepts that users are making a reservation on Defendant's website (here, "Reservations |

The Venetian Resort Last Vegas"), and that users are at the first step of the booking process (here, "view…calendar").  These communications are the product of button clicks on Website Screen 1.

| cd[buttonFeatures] | {"classList":"flex max-w-[120px] flex-1 justify-center rounded-sm border border-gray5 bg-st one80 px-[19.5px] py-[9.5px] min-[475px]:max-w-[200px] border-b-0","destination":"","id":"c alendar-guest-selector-toggle","imageUrl":"","innerText":"GUESTS\n\n3","numChildButtons": 0,"tag":"button","type":null,"name":"","value":""} |
| cd[buttonText] | GUESTS |

77.    As shown by the blue highlights, Meta intercepts the number of total guests selected by users (here, "GUESTS…n3" as in three total guests).  These communications are the product of button clicks on Screen 2.

| cd[buttonFeatures] | {"classList":"flex w-full gap-2 rounded-[3px] border p-4 border-red bg-light-yello w","destination":"","id":"booking-suites-offer-expandable","imageUrl":"","innerTe xt":"Book Direct: Up to 25% Off\n\nWhen you book 2 nights or more","numChild Buttons":0,"tag":"button","type":null,"name":"","value":""} |
| cd[buttonFeatures] | {"classList":"flex items-center gap-2 text-[12px] uppercase tracking-[.36px] text-r ed","destination":"","id":"booking-suites-filters-expandable","imageUrl":"","innerT ext":"FILTERS","numChildButtons":0,"tag":"button","type":null,"name":"","valu e":""} |
| cd[buttonText] | FILTERS |
| cd[buttonFeatures] | {"classList":"flex flex-1 items-center justify-center gap-4 rounded-[32px] px-6 py-3 uppercase border border-gray5 bg-stone80 text-red","destination":"","id":"boo king-suites-filter-tower-venetian","imageUrl":"","innerText":"THE VENETIAN","nu mChildButtons":0,"tag":"button","type":null,"name":"","value":""} |
| cd[buttonText] | THE VENETIAN |
| cd[formFeatures] | [] |
| cd[pageFeatures] | {"title":"Reservations | The Venetian Resort Las Vegas"} |
| cd[buttonFeatures] | {"classList":"sticky bottom-0 flex w-full items-center justify-center bg-red p-7 tex t-[18px] font-bold uppercase tracking-[1.92px] text-gray1 disabled:bg-[#D9D9D 9] disabled:font-medium disabled:text-[#A3A1A1] lg:justify-start lg:text-[14px] lg: font-medium lg:tracking-[1.68]","destination":"","id":"booking-suites-selected-ro om","imageUrl":"","innerText":"NEXT STEP","numChildButtons":0,"tag":"button","t ype":null,"name":"","value":""} |
| cd[buttonText] | NEXT STEP |

78.    As shown by the purple highlights in the above excerpt of the Website's transmissions, Meta intercepts the particular offer selected by users (here, "booking-suites-offer-expandable" and "Book Direct: Up to 25% Off…When you book 2 nights or more").  As shown by

the brown highlights, Meta further intercepts that users click "Filters" to search for different suites (here, "FILTERS"). Specifically, Meta intercepts the particular tower selected by users (here, "THE VENETIAN" and "booking-suites-filter-tower-venetian"), and that users click "Next Step" to continue with the booking process (here, "booking-suites-selected-room" and "NEXT STEP"). These communications are the product of button clicks on Website Screens 3A-3E.

| cd[buttonFeatures] | {"classList":"hidden lg:block ","destination":"","id":"booking-upgrades-card-add-view","imageUrl":"https://www.venetianlasvegas.com/content/dam/vlvweb/suites/venetian/new-luxury-loft-two-queen-suite/sphere-view-1_1200x800.jpg/jcr:content/renditions/cq5dam.web.1280.1280.jpeg?height=156&quality=90&width=128","innerText":"Sphere View\n\n+\n$68\n/\nNIGHT\n\n*Average per suite per night, excluding taxes.\n\r+ ADD VIEW UPGRADE","numChildButtons":0,"tag":"button","type":null,"name":"","value":""} |
|---|---|
| cd[buttonText] | Sphere View |

| cd[buttonFeatures] | {"classList":"sticky bottom-0 flex w-full items-center justify-center bg-red p-7 text-[18px] font-bold uppercase tracking-[1.92px] text-gray1 disabled:bg-[#D9D9D9] disabled:font-medium disabled:text-[#A3A1A1] lg:justify-start lg:text-[14px] lg:font-medium lg:tracking-[1.68]","destination":"","id":"consuer-upgrade-next-cta","imageUrl":"","innerText":"NEXT STEP","numChildButtons":0,"tag":"button","type":null,"name":"","value":""} |
| cd[buttonText] | NEXT STEP |

79.    As shown by the brown highlights in the above excerpt of the Website's transmissions, Meta intercepts that users upgrade their room view and click "Next Step" to continue with the booking process (here, "ADD VIEW UPGRADE" and "Sphere View…+…$68\n" indicating that a user has upgraded to a Sphere View, costing that user an additional $68 per night). These communications are the product of button clicks on Website Screen 4.

| ev | Purchase |
|---|---|
| dl | https://www.venetianlasvegas.com/confirmation-page.html |
| rl | https://www.venetianlasvegas.com/book/checkout |
| if | false |
| ts | 1755727572114 |
| cd[currency] | USD |
| cd[value] | 198.2 |

80.    As shown by the red highlights in the above excerpt of the Website's transmissions, Meta intercepts the fact that users have paid and thus completed the booking process (here, "Purchase" and "confirmation-page"). As shown by the pink highlights, Meta also intercepts the subtotal paid by users (here, "currency"; "USD"; "value"; "198.2", as in the subtotal was $198.20). These communications are the product of button clicks on Website Screen 5.

## VI.    Defendant Enables the Third Parties to Pair the Above Data with Users' Identities

81.    As discussed *supra*, § IV, the Heap, Google, and Meta tracking technologies at issue can pair wiretapped data with website users' identities.

82.    The tracking technologies achieve this, at least in part, through cookies. A cookie is a "small text file (up to 4KB) created by a website that is stored in the user's computer either temporarily for that session only or permanently in storage (persistent cookie)."[62]  Persistent cookies can be used to "track user behavior across different sites. They store information such as geographic location, device specifications, and specific actions taken on the website."[63]

### A.    Heap

44.    To pair wiretapped data with website users' identities, the Heap tracking technologies rely, at least in part, on Heap cookies.

45.    The following image confirms that the Heap tracking technologies on the Website compel that user's browser to transmit the _hp2_id and the _hp2_ses_props cookies:



| Name | Value | Domain ▼ | Path | Expires / M... |
|------|-------|----------|------|----------------|
| _hp2_ses_props.229927628 | ████████████████ | .venetianla... | / | 2025-09-1... |
| _hp2_id.229927628 | ████████████████ i... | .venetianla... | / | 2026-10-1... |

46.    The _hp2_id and _hp2_ses_props cookies are used to "[s]tore a unique user ID, [and s]tore and track interaction."   The _hp2_id and _hp2_ses_props cookies have a lifespan of 14 months.[64]

47.    Heap can also identify individual website users by intercepting and/or otherwise obtaining Website users' Heap User IDs.  "Heap automatically assigns each unidentified user a unique user ID[.]"[65]

48.    Heap goes on to explain that "[w]hen a person interacts with your site ... Heap generates a random unique user ID and stores it in a cookie. ... If a user visits your website on their

---

[62] PC MAGAZINE, COOKIE TABLE, https://www.pcmag.com/encyclopedia/term/cookie.

[63] COOKIEBOT, WHAT ARE TRACKING COOKIES AND HOW DO THEY WORK?, https://www.cookiebot.com/en/tracking-cookies/.

[64] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

[65] HEAP, TRACK USER IDENTITY, https://developers.heap.io/docs/using-identify.

mobile device and their laptop, Heap will recognize 2 different anonymous users because both devices will have different cookies. We can identify these users on both platforms and link the two anonymous users into a single identified user."[66]

49.    That Heap User IDs are paired with Website users' guest record information is evinced by the following image:

| a | 229927628 |
|---|---|
| u | 3109195416958672 |
| v | 183325201861129 |
| s | 4371206882891567 |
| b | web |
| tv | 4.0 |
| z | 2 |
| h | /confirmation-page.html |
| d | www.venetianlasvegas.com |
| t | Reservations | The Venetian Resort Las Vegas |
| r | https://www.venetianlasvegas.com/book/checkout |

### B.    Google

50.    To pair wiretapped data with website users' identities, the Google Analytics identity spaces and Google signals rely, at least in part, on Google cookies.[67]  Together, the Google cookies allow Google Analytics to "'remember' what a user has done on previous pages [and their] interactions with the [W]ebsite."[68]

51.    The following image confirms that, when a user accesses the Website while logged in to a Google account, the Google tracking technologies on the Website compel that user's browser to transmit several Google cookies, including the _Secure-1PAPISID; _Secure-1PSID; _Secure-1PSIDCC; _Secure-1PSIDTS; _Secure-3PAPISID; _Secure-3PSID; _Secure-3PSIDCC; _Secure-

---

[66] HEAP, TRACK USER IDENTITY, https://developers.heap.io/docs/using-identify.

[67] *See, e.g.*, GOOGLE, OUR ADVERTISING AND MEASUREMENT COOKIES, https://business.safety.google/adscookies/; GOOGLE, GOOGLE ANALYTICS COOKIE USAGE ON WEBSITES, https://web.archive.org/web/20240303080533/https://developers.google.com/analytics/devguides/collection/analyticsjs/cookie-usage; OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

[68] GOOGLE, GOOGLE ANALYTICS COOKIE USAGE ON WEBSITES, https://web.archive.org/web/20240303080533/https://developers.google.com/analytics/devguides/collection/analyticsjs/cookie-usage.

---

3PSIDTS; _ga; _gcl_au; _glc_aw; _gcl_gs; ar_debug; AEC; SIDCC; SID; SAPISID; HSID; APISID; NID; and DV cookies:

| Name | Value | Domain | Pa... | Expir... | Size | Http... | Secure | Same... | Partiti... | Cross... | Priority |
|------|-------|--------|-------|----------|------|---------|--------|---------|------------|----------|----------|
| __Secure-1PAPISID | ▉▉▉▉▉ | .google.com | / | 2026-... | 51 | | ✓ | | | | High |
| __Secure-1PSID | ▉▉▉▉▉ | .google.com | / | 2026-... | 167 | ✓ | ✓ | | | | High |
| __Secure-1PSIDCC | ▉▉▉▉▉ | .google.com | / | 2026-... | 91 | ✓ | ✓ | | | | High |
| __Secure-1PSIDTS | ▉▉▉▉▉ | .google.com | / | 2026-... | 93 | ✓ | ✓ | | | | High |
| __Secure-3PAPISID | ▉▉▉▉▉ | .google.com | / | 2026-... | 51 | | ✓ | None | | | High |
| __Secure-3PSID | ▉▉▉▉▉ | .google.com | / | 2026-... | 167 | ✓ | ✓ | None | | | High |
| __Secure-3PSIDCC | ▉▉▉▉▉ | .google.com | / | 2026-... | 91 | ✓ | ✓ | None | | | High |
| __Secure-3PSIDTS | ▉▉▉▉▉ | .google.com | / | 2026-... | 93 | ✓ | ✓ | None | | | High |
| _ga | ▉▉▉▉▉ | .venetianlasvegas.com | / | 2026-... | 30 | | | | | | Medi... |
| _ga_YJMRDRZX8X | ▉▉▉▉▉ | .venetianlasvegas.com | / | 2026-... | 59 | | | | | | Medi... |
| _gcl_au | ▉▉▉▉▉ | .venetianlasvegas.com | / | 2025-... | 31 | | | | | | Medi... |
| _gcl_aw | ▉▉▉▉▉ | .venetianlasvegas.com | / | 2025-... | 113 | | | | | | Medi... |
| _gcl_gs | ▉▉▉▉▉ | .venetianlasvegas.com | / | 2025-... | 36 | | | | | | Medi... |
| AEC | ▉▉▉▉▉ | .google.com | / | 2026-... | 61 | ✓ | ✓ | Lax | | | Medi... |
| APISID | ▉▉▉▉▉ | .google.com | / | 2026-... | 40 | | | | | | High |
| ar_debug | ▉ | .facebook.com | / | Session | 9 | ✓ | ✓ | None | | | Medi... |
| DV | ▉▉▉▉▉ | www.google.com | / | 2025-... | 80 | | | | | | Medi... |
| HSID | ▉▉▉▉▉ | .google.com | / | 2026-... | 21 | ✓ | | | | | High |
| NID | ▉▉▉▉▉ | .google.com | / | 2026-... | 751 | ✓ | ✓ | None | | | Medi... |
| SAPISID | ▉▉▉▉▉ | .google.com | / | 2026-... | 41 | | ✓ | | | | High |
| SID | ▉▉▉▉▉ | .google.com | / | 2026-... | 156 | | | | | | High |
| SIDCC | ▉▉▉▉▉ | .google.com | / | 2026-... | 79 | | | | | | High |
| SSID | ▉▉▉▉▉ | .google.com | / | 2026-... | 21 | ✓ | ✓ | | | | High |

52.     The _Secure-1PAPISID; _Secure-1PSID; _Secure-1PSIDCC; and _Secure-1PSIDTS cookies are "[t]argeting cookie[s u]sed to create a user profile and display relevant and personalised Google Ads to the user."[69]  The _Secure-1PAPISID; _Secure-1PSID; _Secure-1PSIDCC; and _Secure-1PSIDTS cookies have a lifespan of 2 years.[70]

53.     The _Secure-3PAPISID is a marketing cookie that "[p]rofiles the interests of website visitors to serve relevant and personalised ads through retargeting" and has a lifespan of 2 years.[71]

54.     The _Secure-3PSID cookie is a "[t]argeting cookie[ u]sed to profile the interests of website visitors and display relevant and personalised Google ads" and has a lifespan of 2 years.[72]

---

[69] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

[70] *Id.*

[71] *Id.*

[72] *Id.*

55.    The _Secure-3PSIDCC and _Secure-3PSIDTS cookies are "[t]argeting cookie[s u]sed to create a user profile and display relevant and personalised Google Ads to the user."[73]  The _Secure-3PSIDCC and _Secure-3PSIDTS cookies have a lifespan of 2 years.[74]

56.    The _ga cookie is "used to identify users" and has a lifespan of 2 years.[75]

57.    The _gcl_au marketing cookie is "[u]sed by Google AdSense for experimenting with advertisement efficiency across websites using their services" and has a lifespan of 3 months.

58.    The _glc_aw and _gcl_gs marketing cookies are used for "advertising, including serving and rendering ads, personalizing ads (depending on your ad settings at g.co/adsettings), limiting the number of times an ad is shown to a user, muting ads you have chosen to stop seeing, and measuring the effectiveness of ads" and have a lifespan of 90 days.[76]

59.    The _ar_debug is a marketing cookie used to "[s]tore and track conversions and has a lifespan of 90 days.[77]

60.    The AEC cookie "ensure[s] that requests within a browsing session are made by the user, and not by other sites[,]" and has a lifespan on 6 months.[78]

61.    The SIDCC; SID; SAPISID; HSID; APISID; are marketing cookies that "[a]djust[] the ads that appear in Google Search" and all have a lifespan of 2 years.

62.    The NID marketing cookie "is used to collect website statistics and track conversion rates and Google ad personalization[,]" and has a lifespan of 1 year.

63.    The DV marketing cookie "is used to collect website statistics and track conversion rates and Google ad personalisation" and has a lifespan of 1 year.

---

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] GOOGLE, OUR ADVERTISING AND MEASUREMENT COOKIES, https://business.safety.google/adscookies/.

[78] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

64.     Even when a when a user accesses the Website while not logged in to a Google account, the Google tracking technologies on the Website compel that user's browser to transmit several Google cookies, including the ar_debug; IDE; DSID; NID; AEC; and _ga cookies:



| Name | Value | Domain | Path | Expir... | Size | Http... | Secure | Same... | Partiti... | Cross... | Priority |
|------|-------|--------|------|----------|------|---------|--------|---------|-----------|----------|----------|
| _ga | ████████ | .venetianlasvegas.com | / | 2026-... | 30 | | | | | | Medi... |
| _ga_YJMRDRZX8X | ████████ | .venetianlasvegas.com | / | 2026-... | 59 | | | | | | Medi... |
| _gcl_au | ████████ | .venetianlasvegas.com | / | 2025-... | 32 | | | | | | Medi... |
| NID | ████████ | .google.com | / | 2026-... | 205 | ✓ | ✓ | None | | | Medi... |

65.     Defendant also uses Google signals, which "associates [data] with user[s'] … Google accounts," for "users who have signed in … [and] turned on Ads Personalization."[79]  The below image shows that Defendant enabled Google signals.



```
["map", "redactFieldGroup", "GOOGLE_SIGNALS", "disallowAllRegions", false, "disallowedRegions", ""]],
```

## C.     Meta

66.     Through Facebook cookies, Meta can identify individual website users by their respective Facebook accounts.  Through advanced matching, Meta can also identify individual website users by the personal information they provide on websites (i.e., name, email address, phone number, etc.).

67.     The following image confirms that, when a user accesses the Website while logged into Facebook, the Meta tracking technologies on the Website compel that user's browser to transmit the c_user; _datr; fr; presence; ps_l; ps_n; sb; wd; xs; and _fbp[80] cookies:

///

///

///

///

---

[79] GOOGLE, [GA4] ACTIVATE GOOGLE SIGNALS FOR GOOGLE ANALYTICS PROPERTIES, https://support.google.com/analytics/answer/9445345.

[80] Note, the Meta Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—i.e., the Website. PC MAGAZINE, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. PC MAGAZINE, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook. Pictured here and in the infra two images is the _fbp cookie, sent as a first-party cookie.

| Name | Value | Domain | Path | Expir... | Size | Http... | Secure | Same... | Partit... | Cross... | Priority |
|------|-------|--------|------|----------|------|---------|--------|---------|-----------|----------|----------|
| APISID | █████ | .google.com | / | 2026... | 40 | | | | | | High |
| ar_debug | █ | .facebook.com | / | Sessi... | 9 | ✓ | ✓ | None | | | Medi... |
| c_user | █████ | .facebook.com | / | 2026... | 20 | | ✓ | None | | | Medi... |
| datr | █████ | .facebook.com | / | 2026... | 28 | ✓ | ✓ | None | | | Medi... |
| fr | █████ | .facebook.com | / | 2025... | 122 | ✓ | ✓ | None | | | Medi... |
| presence | █████ | .facebook.com | / | Sessi... | 75 | ✓ | ✓ | | | | Medi... |
| ps_l | █ | .facebook.com | / | 2026... | 5 | ✓ | ✓ | Lax | | | Medi... |
| ps_n | █ | .facebook.com | / | 2026... | 5 | ✓ | ✓ | None | | | Medi... |
| SAPISID | █████ | .google.com | / | 2026... | 41 | | ✓ | | | | High |
| sb | █████ | .facebook.com | / | 2026... | 26 | ✓ | ✓ | None | | | Medi... |
| wd | █████ | .facebook.com | / | 2025... | 10 | | ✓ | Lax | | | Medi... |
| xs | █████ | .facebook.com | / | 2026... | 48 | ✓ | ✓ | None | | | Medi... |
| _fbp | █████ | .venetianlasvegas.com | / | 2025... | 41 | | | Lax | | | Medi... |

68.     The c_user cookie contains, at least, the user's unencrypted Facebook ID.[81]   The c_user cookie has a lifespan of three hundred sixty-five days.[82]   The c_user cookie is "[u]sed in conjunction with the xs cookie to authenticate your identity to Facebook."[83]

69.     The datr cookie contains, at least, a value that uniquely identifies a browser.[84]   The datr cookie has a lifespan of four hundred days.[85]

70.     The fr cookie contains, at least, a value that uniquely identifies a browser and the user's encrypted Facebook ID.[86]   The fr has a lifespan of ninety days.[87] The fr marketing cookie "[c]ontains a unique browser and user ID, used for targeted advertising."[88]

---

[81] MICROSOFT, COOKIE COMPLIANCE, https://learn.microsoft.com/en-us/dynamics365/commerce/cookie-compliance ("Cookie[:] c_user[.] Description[:] Cookie contains the user ID of the currently signed-in user.").

[82] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[83] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

[84] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/ ("'Datr' is a unique identifier for your browser[.]").

[85] Id.

[86] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf ("The first part of the cookie is a browser ID, used to identify the web browser. The second part of the cookie is an encrypted version of the logged in user's Facebook ID.").

[87] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[88] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

71.     The _fbp cookie contains, at least, a value that uniquely identifies a browser.[89]  The _fbp has a lifespan of ninety days.[90]

72.     The xs marketing cookie is "[u]sed in conjunction with the c_user cookie to authenticate your identity to Facebook. Contents: Session ID, creation time, authentication value, secure session state, caching group ID" and has a lifespan of 90 days.[91]

73.     The sb marketing cookie is for "Facebook browser identification, authentication, marketing, and other Facebook-specific function[s]" and has a lifespan of 2 years.[92]

74.     When a Website visitor's browser has recently logged out of an account, Facebook still compels the visitor's browser to send the _fbp; datr; fr; and sb cookies:

| Name | Value | Domain | Path | Expir... | Size | Http... | Secure | Same... | Partiti... | Cross... | Priority |
|------|-------|--------|------|----------|------|---------|--------|---------|-----------|----------|----------|
| _fbp | ███████ | .venetianlasvegas.com | / | 2025-... | 41 | | | Lax | | | Medi... |
| datr | ███████ | .facebook.com | / | 2026-... | 28 | ✓ | ✓ | None | | | Medi... |
| fr | ███████ | .facebook.com | / | 2025-... | 122 | ✓ | ✓ | None | | | Medi... |
| ps_l | █ | .facebook.com | / | 2026-... | 5 | ✓ | ✓ | Lax | | | Medi... |
| ps_n | █ | .facebook.com | / | 2026-... | 5 | ✓ | ✓ | None | | | Medi... |
| sb | ██████ | .facebook.com | / | 2026-... | 26 | ✓ | ✓ | None | | | Medi... |
| wd | ██████ | .facebook.com | / | 2025-... | 10 | | ✓ | Lax | | | Medi... |

75.     Defendant also uses "Advanced Matching."  With Advanced Matching, Defendant's Meta Pixels "look for recognizable form field and other sources on [the] website that contain information such as first name, last name and email."[93]  That information is recorded, "along with the event, or action, that took place."[94]

76.     Specifically, as part of Advanced Matching, Defendant enabled "Automatic Advanced Matching."  That means Defendant configured the pixel to scan form fields containing a

---

[89] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/ ("Cookie[:] _fbp[.] Description[:] These cookies identify browsers for businesses using our Meta Products for the purposes of providing advertising and site analytics services."). *See also* FACEBOOK, CUSTOMER INFORMATION PARAMETERS, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters#fbp ("The Facebook browser ID value is stored in the _fbp browser cookie[.]").

[90] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[91] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

[92] *Id.*

[93] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668.

[94] *Id.*

user's email address, first name, last name, phone number, gender, zip code, city and state.[95] The

highlighted line below shows that Defendant enabled Automatic Matching.

```
94          instance.optIn("332042860855881", "InferredEvents", true);
95          fbq.loadPlugin("automaticmatchingforpartnerintegrations");
96          instance.optIn("332042860855881", "AutomaticMatchingForPartnerIntegrations", true);
97          config.set(null, "batching", {
-               "batchWaitTimeMs": 10,
-               "maxBatchSize": 10
```

77.    Thus, Meta, as enabled by Defendant, contemporaneously intercepts users' names,

email address, phone numbers, and/or other personal details using the Meta Pixel on various pages

of the Website.  Although these personal details are "hashed,"[96] the reality is that, even in hashed

form, they are traceable to individuals.[97]

78.    Defendant discloses this information to Meta so that Meta can better match Website

visitors to their Facebook profiles, thereby helping Defendant "[i]ncrease the number of attributed

conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per conversion."[98]

///

///

---

[95] *See* META, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/ advanced-matching; META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/ business/help/611774685654668.

[96] *Id.*

[97] *See, e.g.*, FEDERAL TRADE COMMISSION, DOES HASHING MAKE DATA "ANONYMOUS"?, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong."); FEDERAL TRADE COMMISSION, NO, HASHING STILL DOESN'T MAKE YOUR DATA ANONYMOUS, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); STEVEN ENGLEHARDT ET AL., I NEVER SIGNED UP FOR THIS! PRIVACY IMPLICATIONS OF EMAIL TRACKING, https://petsymposium.org/2018/files/papers/issue1/ paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful privacy protection. This is folk knowledge in the security community, but bears repeating."); MARTECH, FTC PRIVACYCON: YOUR EMAIL ADDRESS IS LEAKING AND VULNERABLE, https://martech.org/ftc-privacycon-email-address-leaking-vulnerable ("Hashing is an algorithmic process that turns [information] into a gibberish label[.] … Although gibberish, it's unique, so it can be employed as an anonymized identifier. It's supposed to be one-way, meaning that you can't turn the gibberish back into the [original form]. Wrong, says Englehardt and his colleagues.").

[98] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/ business/help/611774685654668.

---

## VII.   The Third Parties Use Californians' Data for their Own Purposes

79.     When the Third Parties use their respective wiretaps on Website users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other.   Instead, the Third Parties – separate and distinct entities from the parties to the conversations—use the wiretaps to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties.   The Third Parties, themselves, collect the contents of said conversations.   That data is then analyzed by the Third Parties before being provided to any entity that was a party to the conversations (like Defendant).

80.     The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes.

81.     In the Contentsquare Master Service Agreement, Heap's parent company, Contentsquare,[99] states that "Customer[s] authorize[] and grant[] Contentsquare and its Affiliates a non-exclusive, perpetual, worldwide, royalty-free, right and license to (i) compile, access and use Customer Data, strictly in order to **research, develop, modify, improve or support the services** provided by Contentsquare and its Affiliates; (ii) use Customer Data in an anonymous or aggregated form where no such information could directly identify or will reasonably be used to identify Customer, Customer's Users or its Visitors, **for benchmarking or machine learning purposes**; (iii) collect and use Usage Data for its **business purposes, including industry analysis, analytics, marketing, and developing, training and improving its products and services** ("Internal Development"); and (iv) anonymize or aggregate Visitor Data for any **further internal business uses**, including Internal Development, creating and distributing statistical insights, reports and other materials."[100]   The "Master Services Agreement" makes clear that "'Customer Data' means[] … Visitor Data[]"; "'Visitor' means a visitor of the Customer Site(s) and/or the Customer App(s)"; "'Visitor Data' means the data relating to a Visitor that is processed by Contentsquare in connection with Customer's use of the CS Service"; and the "CS Service includes Script(s)[,]" which are "the

---

[99] Heap was acquired by Contentsquare.  *See supra* note 1.

[100] CONTENTSQUARE MASTER SERVICE AGREEMENT (June 2025), https://www.heap.io/legal/heap-master-services-agreement (last accessed June 11, 2025) (emphasis added).

JavaScript or software development kit (SDK) generated by Contentsquare and provided to Customer as part of the CS Service (as the case may be)[.]"[101]

82.    Thus, Heap (and/or Contentsquare) has the capability to use wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, researching, developing, modifying, improving, and supporting Heap (and/or Contentsquare) services; benchmarking or machine learning; analytics and marketing; and creating and distributing statistical insights, reports, and other materials.

83.    In its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "When Google Analytics customers enable the data sharing setting for … Google Analytics[] and accept the 'Measurement Controller-Controller Data Protection Terms' … Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance."[102]  Thus, Google has the capability to use the wiretapped data for understanding online behavior and trends, machine learning, and improving its products and services.

84.    In its "Meta Business Tools Terms,"[103] Meta confirms that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendant.  For instance, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products."[104]  Further, Meta can "disclose [] Campaign Reports or Analytics … to [] third part[ies,] … [if] they have been combined with Campaign Reports and Analytics from

---

[101] *Id.*

[102] GOOGLE, SHARED DATA UNDER MEASUREMENT CONTROLLER-CONTROLLER DATA PROTECTION TERMS, https://support.google.com/analytics/answer/9024351.

[103] META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

[104] *Id.*

---

numerous other third parties and [the advertiser using the Meta Business Tools has had its] identifying information [] removed from the combined Campaign Reports and Analytics."[105]   And Meta can use the information it collects to "improve the effectiveness of ad delivery, [] determine the relevance of ads to people[,] … [and] personalize the features and content (including ads and recommendations) that [Meta] show[s] people on and off [] Meta Products."[106]   Thus, Meta has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, its own research and development; ad delivery; feature and content personalization; and product improvement, provision, and securement.

## VIII.   Defendant Never Received Users' Consent to Disclose their Confidential Communications to the Third Parties

85.   Crucially, neither Defendant nor the Third Parties procure prior consent from Californians for Heap, Google, or Meta to engage in this wiretapping.

86.   Nowhere on the Website does Defendant provide notice of its privacy-related practices that is prominently displayed, designed to attract Website users' attention, and distinctive in appearance.

87.   Nowhere on the Website does Defendant adequately disclose the tracking here at issue, including that:

- The Third Parties, as enabled by Defendant, intercept the contents of Californians' communications on the Website, in real time.

- These communications include, but are not limited to, "guest records," which are affirmatively entered by users on the Website and confidential under Cal. Civil Code § 53.5(c).  Namely, the Third Parties intercept Website users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular hotel and room type in which they wish to stay.  The Third Parties also intercept the URL of webpages visited by Website users – containing the foregoing communications.

- This information is not anonymized because Defendant enables the Third Parties to link users' communications with personal information that reveals their identities.  Such personal information includes cookie IDs/the values contained in cookies, cross-device IDs, device IDs, email addresses, and/or

---

[105] *Id.*

[106] *Id.*

phone numbers, which constitute "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c).

88.     Nowhere on the Website does Defendant request or receive Website users' affirmative consent *prior to* enabling the Third Parties' tracking technologies. Analysis of the Website reveals that the Third Parties' tracking technologies are active as soon as the Website loads, before Website users could even conceivably be put on notice or provide affirmative consent.

## CLASS ALLEGATIONS

89.     Plaintiff seeks certification of the following class: all California residents who have accessed and navigated the Website while in California (the "Class").

90.     Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

91.     The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

92.     **Numerosity:** The number of persons within the Class is substantial and believed to amount to thousands, if not millions of persons. It is, therefore, impractical to join each member of the Class as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Class render joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Class is ascertainable and identifiable from Defendant's records.

93.     **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary

between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632 and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

94.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, visited the Website and had her confidential electronic communications intercepted and disclosed to the Third Parties.

95.    **Adequate Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

96.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.   Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631(a)**

97.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

98.     Plaintiff brings this Count individually and on behalf of the members of the Class.

99.     CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

100.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

101.    The Third Parties' tracking technologies are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

102.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal.

1   2021). Further, the Third Parties have the capability to use the wiretapped information for their own

2   purposes. Accordingly, Heap, Google, and Meta were third parties to any communication between

3   Plaintiff and Class Members, on the one hand, and Defendant, on the other. *Id*. at 521; *see also*

4   *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

5       103.   At all relevant times, by their tracking technologies, the Third Parties willfully and

6   without the consent of all parties to the communication, or in any unauthorized manner, read,

7   attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff

8   and Class Members, on the one hand, and Defendant, on the other, while the electronic

9   communications were in transit or were being sent from or received at any place within California.

10      104.   At all relevant times, the Third Parties used or attempted to use the communications

11  intercepted by their tracking technologies for their own purposes.

12      105.   At all relevant times, Defendant aided, agreed with, employed, permitted, or

13  otherwise enabled the Third Parties to wiretap Plaintiff and Class Members using the Third Parties'

14  tracking technologies and to accomplish the wrongful conduct at issue here.

15      106.   Plaintiff and Class Members did not provide their prior consent to the Third Parties'

16  intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and

17  Class Members' electronic communications. Nor did Plaintiff and Class Members provide their prior

18  consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third

19  Parties' conduct.

20      107.   The wiretapping of Plaintiff and Class Members occurred in California, where

21  Plaintiff and Class Members accessed the Website and where the Third Parties – as enabled by

22  Defendant – routed Plaintiff's and Class Members' electronic communications to the Third Parties'

23  servers.

24      108.   Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured

25  by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of

26  Defendant's violations of CIPA § 631(a).

27

28

1

## <u>COUNT II</u>
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 632**

2

3      109.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth

4      herein.

5      110.    Plaintiff brings this Count individually and on behalf of the members of the Class.

6      111.    CIPA § 632(a) prohibits an entity from:

7
8      intentionally and without the consent of all parties to a confidential
       communication, uses an electronic amplifying or recording device to
9      eavesdrop upon or record the confidential communication, whether the
       communication is carried on among the parties in the presence of one
10     another or by means of a telegraph, telephone, or other device, except a
       radio.

11     112.    The Third Parties' tracking technologies are "electronic amplifying or recording

12     device[s]." *Id.*

13     113.    Cal. Civ. Code § 53.5(a) states:

14
15     [A]n innkeeper, hotelkeeper, motelkeeper, lodginghouse keeper, or owner
       or operator of an inn, hotel, motel, lodginghouse, or other similar
       accommodations, or any employee or agent thereof, who offers or accepts
16     payment for rooms, sleeping accommodations, or board and lodging, or
       other similar accommodation, shall not disclose, produce, provide, release,
17     transfer, disseminate, or otherwise communicate, except to a California
18     peace officer, all or any part of a guest record orally, in writing, or by
       electronic or any other means to a third party without a court-issued
19     subpoena, warrant, or order.

20     114.    Per Cal. Civil Code § 53.5(c):

21
22     "Guest record" for purposes of this section includes any record that
       identifies an individual guest, boarder, occupant, lodger, customer, or
       invitee, including, but not limited to, their name, social security number or
23     other unique identifying number, date of birth, location of birth, address,
       telephone number, driver's license number, other official form of
24     identification, credit card number, or automobile license plate number.

25     115.    Here, Website users' communications with Defendant – made while browsing and

26     booking Venetian hotel stays via the Website – contain sensitive and confidential "guest records,"

27     as defined by Cal. Civil Code § 53.5.

28

116.    First, the communications include "record[s] that identif[y] an individual[.]"  Cal. Civil Code § 53.5(c).  Defendant enables Heap to identify individual Website users through a combination of Heap cookies and Heap user IDs.  Defendant enables Google to identify individual Website users with Google Analytics identity spaces – a combination of user IDs, user-provided data (i.e., contact details like email address, phone number, name, and/or address, etc.), device IDs, and/or machine learning-based behavioral modeling – and Google signals (which associates web browsing activity with users' Google accounts). Defendant also enables Meta to identify individual Website users through advanced matching, by which Meta records the contact details Website users provide on the Website (i.e., name, email address, phone number, etc.).  These pieces of data collected by Heap, Google, and Meta constitute "record[s] that identif[y] an individual" (Cal. Civil Code § 53.5(c)), as the cookies and other IDs at issue contain "unique identifying number[s]" assigned to Website users (*id.*) and the contact details (i.e., name, email address, phone number, etc.) at issue are sufficient to identify individuals.  *Id.*

117.    Second, Website users' communications with Venetian "identif[y] an individual [as a Venetian] guest, boarder, occupant, lodger, customer, or invitee[.]"  *Id.*  The Third Parties intercept Website users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular tower and room type in which they wish to stay.  The Third Parties also intercept the URL of webpages visited by Website users – containing the foregoing communications. These communications "identif[y] an individual [as a Venetian] guest, boarder, occupant, lodger, customer, or invitee" (Cal. Civil Code § 53.5(c)) because they show that all Website users are "invitees" of Venetian – individuals with "express or implied invitation to enter or use [Venetian's] premises."[107]  These communications also identify certain Website users (those who complete the booking process) as Venetian hotel "guests" and "customers."

118.    Thus, the Third Parties – as aided by Defendant – intercepted "guest records," which are confidential, under Cal. Civil Code § 53.5.  Moreover, none of the Third Parties is a legitimate "third-party service provider," as defined by Cal. Civil Code § 53.5(f), because none of the Third

---

[107] INVITEE, Black's Law Dictionary (11th ed. 2019).

Parties is "an entity contracted to provide services outlined in [a] contract [with Venetian] that has no independent right to use or share the data beyond the terms of the contract." Rather, the Third Parties have the capability to use the information they wiretap for purposes other than simply providing a recording to Defendant. Therefore, Defendant's conduct here at issue was not permitted by Cal. Civil Code § 53.5(i).

119.     When communicating with Defendant, Plaintiff and Class Members had an objectively reasonable expectation of privacy, based on Cal. Civil Code § 53.5. Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Heap, Google, and Meta, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

120.     Plaintiff and Class Members did not consent to any of the Third Parties' actions. Nor have Plaintiff or Class Members consented to the Third Parties' intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

121.     Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the statute referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)     For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

1          (e)      For prejudgment interest on all amounts awarded;

2          (f)      For an order of restitution and all other forms of equitable monetary relief;

3

4          (g)      For injunctive relief as pleaded or as the Court may deem proper; and

5          (h)      For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

6

7                    **<u>JURY TRIAL DEMAND</u>**

8      Plaintiff demands a trial by jury on all causes of action and issues so triable.

9

10 Dated: September 17, 2025            Respectfully submitted,

11                        **BURSOR & FISHER, P.A**.

12

13                        By:    */s/ Philip L. Fraietta*                    Philip L. Fraietta

14                        Philip L. Fraietta (State Bar No. 354768)

15                        50 Main Street, Suite 475 White Plains, NY 10106

16                        Telephone: (914) 874-0708 Facsimile: (914) 206-3656

17                        Email: pfraietta@bursor.com

18                        **BURSOR & FISHER, P.A.**

19                        Stefan Bogdanovich (State Bar No. 324525)

20                        1990 North California Blvd., 9th Floor Walnut Creek, CA 94596

21                        Telephone: (925) 300-4455

22                        Facsimile:  (925) 407-2700 E-mail: sbogdanovich@bursor.com

23                        *Attorneys for Plaintiff*

24

25

26

27

28